UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————— )
                                                      )
WASHTENAW COUNTY                      )
EMPLOYEES' RETIREMENT               )
SYSTEM, et al.,                                   )
                                                      )
                    Plaintiffs,                      )
                                                      )
v.                                                       )         Civil Action No. 11-10186-NMG
                                                      )
THE TALBOTS, INC., et al.,                )
                                                      )
                    Defendants.                    )
———————————————————— )

REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION TO DISMISS

July 3, 2013

SOROKIN, M.J.

        The Plaintiffs bring this putative federal securities class action pursuant to the Securities

Exchange Act of 1934 ('Exchange Act') on behalf of purchasers of the common stock of The

Talbots, Inc. ('the Company')  between December 8, 2009 and January 11, 2011 ('the Class

Period').  Docket # 53.  Currently pending is the Defendants' Motion to Dismiss the Second

Amended Complaint.  Docket # 56.  Both the Second Amended Complaint and the briefing are

extensive.  Although this is the first Report and Recommendation on a dispositive motion in this

case, the Parties have twice fully briefed the issue.  The Report and Recommendation is lengthy

for it recounts in detail the extensive allegations before proceeding to address the many

arguments advanced by the Defendants.  Largely due to a failure to plead sufficiently materiality,

scienter and loss causation (see infra, at 35-46), I RECOMMEND that the Court ALLOW the motion.

I.      FACTUAL AND PROCEDURAL BACKGROUND [1]

The Company is a retailer and direct marketer of women's apparel, accessories and shoes, with its principal place of business in Hingham, Massachusetts.[2]  Docket # 53 at ¶¶ 2, 12. It sells its products in retail stores, as well as via mail order catalogs and online/internet operations.  Id. at ¶ 2.  As of January, 2011, the Company operated 568 stores, including retail stores, upscale outlets, and surplus outlets.  Id. at ¶ 43.  The Company's common stock is traded on the New York Stock Exchange.  Id. ¶ 2.  Defendant Trudy F. Sullivan was at all relevant times the Chief Executive Officer and President of the Company.  Id. at ¶ 13.  Defendant Michael Scarpa was at all relevant times the Chief Financial Officer and Chief Operating Officer of the Company.  Id. at ¶ 14.

The proposed class consists of all purchasers of the Company's stock during the Class Period, which runs between December 8, 2009 and January 11, 2011.  Id. at ¶ 1.  Plaintiff Macomb County Employees' Retirement System purchased Talbots common stock on the open market.  Id. at ¶ 11.  On April 25, 2011, the Court allowed Macomb County Employees' Retirement System's motion for appointment as Lead Plaintiff.  Docket # 21.

---

[1]  Because there are a large number of alleged misrepresentations, the recitation of facts is divided herein into several time periods, with the misrepresentations allegedly occurring within each period recited immediately thereafter (along with relevant Company disclosures).

[2]  In keeping with the standard applicable to Rule 12 motions, the allegations of the Second Amended Complaint are recited as if true.

Vendor Payment Issues

At the outset of the Class Period (in December, 2009), the Company was experiencing severe cash flow problems as a result of heavy competition, declining sales and significant debt. Id. at ¶ 44.  According to Confidential Witness (CW) 5, who was an Assistant Sourcing Manager, beginning in the summer of 2008, the Company could no longer afford to pay its vendors in a timely manner, and the problem worsened during 2009.  Id. at ¶¶ 46-47.  Some of the Company's vendors were completing only portions of the Company's orders, while others were rejecting the Company's orders altogether.  Id.  According to CW 13, who was responsible for "vendor due diligence," all payments to the Company's overseas vendors were late during the summer of 2009.  Id. at ¶ 47.  According to the same CW, in the summer of 2009, the Company owed money to vendors in various stages of fulfilling orders: i.e., those who had not yet started production; those who had started production; and, those who had finished production and were holding the shipment or had consigned merchandise to a bank until paid.  Id.

For example, according to CW 6, who was a Sourcing Manager, in 2009, a sweater vendor named Great Brilliance suspended production of the Company's merchandise and asked to see its books.  Id. at ¶ 46.  According to the same CW, another sweater vendor, SSHY, was concerned in May, 2009 about the Company's debt to it ($1 million or more) and as a result it raised the per-garment price it offered the Company for a new order by ten percent.  Id. at ¶¶ 48-49.  The same CW also alleges that some vendors who had shipped merchandise to the U.S. were consigning the merchandise to banks when it arrived at the docks in Southern California.  Id. at ¶ 52.

According to CW 9, another Sourcing Manager, an Indian vendor, Ambator, delayed for

several months its shipment of hundreds of thousands of units of cotton button-up shirts (one of the Company's staple products) in approximately August, 2009, because it had not been paid. Id. at ¶ 51.

CW 18 worked as a Merchant in the Merchandising Department.  Id. at ¶ 40.  CW 18 reported that shortly after April, 2009, vendors were "holding orders hostage" because of the Company's non-payment.  Id. at ¶ 53.  CW 18 learned that orders were missing and had not been shipped via the Company's order tracking systems, which reflected that within months of April, 2009, orders were "not showing up" as delivered by the scheduled date, and that the number of orders for which the delivery dates were missed began to "increase fairly quickly" in 2009.  Id. CW 18 reports that he/she learned that vendors were not being paid through conversations with Company Sourcing Managers and with the Company's Executive Vice President and General Merchandising Manager, who learned of the issue from Sullivan.  Id. at ¶ 54.  CW 18 reports that the Company's Executive vice President and General Merchandising Manager "'shared facts' from Sullivan with CW 18 and others prior to August, 2010 concerning vendors not being paid and that the failure to pay vendors was the reason the Company was "not getting orders."  Id.

CW 5, a Sourcing Manager, reported (based upon conversations with other Sourcing Managers) that the Company's vendor payment problem was pervasive and estimated that the Company owed a total of about $30 million to vendors during the Class Period.  Id. at ¶ 56.  CW 18 (a Merchant) reported that vendors were not paid for orders "across the board," and that the unpaid vendors included "big vendors," which negatively impacted Company sales because orders arrived as much as two months late.  Id. at ¶ 57.  CW 6, a Sourcing Manager, reported that delays in vendor payments caused delays in delivery of merchandise and, ultimately, missed

sales.  Id. at ¶ 58.  CW 6 reported that it typically took nine months to one year from concept to

the time sweaters were available for customers to purchase online, from a catalog or in the

Company's stores and that delays in vendor payments meant delays in delivery of merchandise

and, ultimately, missed sales.  Id.  CW 5 left the Company in January, 2010 and CW 6 left the

Company in October, 2009.  Id. at ¶¶ 27-28.

In or around January, 2010, near the beginning of the Class Period, the Company had

received a cash infusion as a result of the completion of a merger and exchange offer and related

financing.  Id. at ¶ 4.

The Plaintiffs allege that the Defendants knew that failures to pay vendors in mid-to-late

2009  "would result in delays and order cancellations that would have a significant impact on the

Company's sales in the second half of 2010 because the Company would not have in stores

much of the merchandise it was advertising in its catalogs and elsewhere."  Id. at ¶ 60.

According to CW 6, a Sourcing Manager, an order that was to be available to customers in

August/September 2010, would most likely have to have been locked in with vendors by fall

2009 to allow for shipping in June 2010.  Id. at ¶ 59.

The Company's 2008 Form 10-K, filed with the Securities and Exchange Commission

and dated April 16, 2009, had included the following disclosure:

> In addition, we have and are continuing to take significant steps to improve
> inventory management, such as managing leaner inventories, changing our
> markdown cadence, and the implementation of a price optimizing software tool. We
> cannot provide assurance that these steps will continue to be successful in improving
> merchandise gross margins. Moreover, inventory levels in excess of customer
> demand result in inventory markdowns and movement of the inventory to our outlet
> facilities to be sold at discount or closeout prices which would negatively impact
> operating results and could impair our brand image. In contrast to that scenario, if we
> underestimate customer demand or for any other reason fail to supply adequate
> levels of quality products in a timely manner, we could experience inventory

shortages resulting in missed sales opportunities, negative impact on customer loyalty and loss of revenues.

Docket # 59-1 at 21.[3]

Alleged December, 2009 Misrepresentations

In general, the Plaintiffs allege that the Defendants misrepresented the Company's ability to bring its products to market in a timely fashion, as well as the resulting impact that the Company's lack of inventory control and deteriorating relationship with its clothing vendors was having on the Company's sales.  Docket # 53 at ¶ 3.

On the first day of the Class Period (December 8, 2009), the Company issued a press release reporting financial results for the third quarter of 2009.  Included were Sullivan's comments on the Company's financial results, in which she stated, in pertinent part:

> Our third quarter results demonstrate tremendous operational discipline and solid execution of our strategic initiatives to drive improved performance of the business and restore profitability. ***The efforts over the past several quarters – particularly in the areas of*** strengthening our merchandise offering and ***tightly managing inventory and expense – have created a much stronger, leaner and profitable organization***.

Id. at ¶ 102 (emphasis in original).

During a conference call to discuss the Company's third quarter 2009 financial results, Sullivan and Scarpa allegedly misled investors concerning the Company's purported disciplined inventory management, as follows.

Sullivan made the following statements:

> These results demonstrate our tremendous operational discipline and

---

[3]  Page citations throughout are to the pagination assigned by the Court's CM/ECF docketing system, rather than to any internal pagination of the documents cited.

> solid execution of our strategic initiatives to restore profitability. As planned, we were less promotional in the third quarter compared to last year, ***and we effectively managed our inventory***.

> .     .     .

> We believe that our full-priced business and our focused promotional activity will benefit fourth quarter gross margin. ***We will continue our conservative posture, staying the course with our efforts and discipline around inventory and costs, driving improvement and efficiencies throughout the organization***.

> .     .     .

> We have worked hard over the past two years retooling our internal processes and orchestrating a turnaround of our Talbots brand. I could not be more pleased with where we are at this particular juncture. We have made great progress in modernizing our merchandise and ***we are operating with much leaner inventory***, a leaner corporate staff and a dramatically reduced capital spending plan.

> And as I stated earlier, ***looking at our third quarter results and our outlook for holiday season in Q4, the Company has begun to realize a significant benefit from all of these changes for the benefit of all of our shareholders***.

<u>Id.</u> at ¶¶ 103, 105 (emphasis in original).

Scarpa made the following statements:

> ***[O]ur business model is clearly improving . . .we are making excellent progress in reshaping our operations to return to consistent profitable growth as a dynamic specialty retailer***.

> .     .     .

> ***Our posture remains conservative given the uncertain environment with a focus on*** expense management, ***inventory control***, liquidity, and cash flow. And we expect that our transition with BPW to substantially enhance our balance sheet and our future competitiveness.

<u>Id.</u> at ¶ 104 (emphasis in original).

7

During the December 8, 2009 conference call, Sullivan and Scarpa each discussed the Company's full price sales and inventory trends.  Sullivan made the following statements:

> [I]t's important to realize strategically we've put a real emphasis on the ratio of full-price to markdown inventory. ***We've managed our inventories very, very carefully***.  We've managed our flow carefully. We've also really reengineered our merchandise mix to have a very compelling offer of key items, which as I said in my remarks are over 50% of our sales in the quarter. So all of these things combined have come to fruition to really enable us to have a much higher percentage of full-price sales to markdown sales, and that is our strategy for fourth quarter and going into 2010.
>
> .     .     .
>
> ***we are being incredibly disciplined when it comes to inventory***.

Id. at ¶¶ 106, 108 (emphasis in original).

Scarpa made the following statements:

> That being said, as we get into Q2 and Q3 of next year, we think that all the excess inventory that was purchased for the spring 2009 six-month season we will anniversary, and thus we think that ***we should start to see a much more positive comp as we end up Q2 and as we move into Q3 of next year***.
>
> .     .     .
>
> We want her sale, regardless of what channel she chooses, to engage with us and we will continue to be ***-- we're not ever going to go back to the over inventory days of our past. We're going to continue to be extremely focused***.

Id. at ¶ 107, 109 (emphasis in original).

The Plaintiffs allege that the individual Defendants' December 8, 2009, statements described supra were misrepresentations because Sullivan and Scarpa knew that the Company had not tightly managed its inventory or controlled its expenses, but that in fact the Company

had been late in making payments to many of vendors throughout 2009, resulting in disputes with those vendors, delayed and cancelled orders, and increased costs to the Company.  Id. at ¶ 113.[4]

Statements of January 14, 2010

On January 14, 2010, the Company hosted a conference call at the 12th Annual ICR XChange Conference, during which Scarpa made the following alleged misrepresentations.

> **Our performance demonstrates tremendous operational discipline and solid execution of our strategic initiatives to restore this great company to profitability**. After five consecutive quarters of operating losses, we achieved profitability in the third quarter, reporting $24 million in adjusted operating income, which excludes restructuring and impairment charges
>
> .      .      .
>
> **We have maintained an acute focus on improved inventory management**. We are doing a much better job of delivering a monthly flow of fresh new merchandise across all channels, and we are marking down our goods optimally. We remain conservative in our posture, and at the end of the third quarter we were operating with inventories down approximately 27% compared to last year and down approximately 40% on a two-year roll.
>
> .      .      .
>
> We anticipated a decline in sales in the third quarter due to very lean inventories compared to last year. We did slightly better than our expectations, due in part to improved regular price selling, which increased 10% in the month of October. This is very encouraging and not only reflects a positive customer response, but drove significantly improved merchandise margins **given our strong**

---

[4]  The Court notes that the Company reported the value of its inventory in its regulatory filings.  For example, on June 8, 2010, it reported that on May 1, 2010 it had had $156.7 million in inventory on hand, that it had had $142.7 million on hand on January 30, 2010, and that it had had $190.7 million in inventory on hand on May 2, 2009.  Docket # 59-9 at 5.  The Plaintiffs have not challenged the accuracy of these figures.

> **discipline on inventory management**.
>
> .      .      .
>
> In closing, we have accomplished a great deal in a very short period of time. **We have revitalized our brand, dramatically improved the fundamentals of our business, and restored profitability. Our investment thesis is strong and getting stronger**.

Id. at ¶¶ 113-114 (emphasis in original).

The Plaintiffs allege that these statements were false because the statement that the Company had strong discipline in inventory management omitted material information that a reasonable investor would have wanted to know when making decisions (namely, that vendors were cancelling and delaying the Company's orders, that the Company was forced to prioritize orders to get products into stores, and that as a result, the Company's merchandise would not arrive in its stores on time for the fall and winter 2010 seasons). Id. at ¶ 115.

Allegations Concerning Spring, 2010

In January, 2010, a merger with BPW Acquisition Corp. and related third-party financing provided the Company with a cash infusion. Docket # 53 at ¶ 44.

According to CW 17 (who assisted the Global Sourcing Managers), beginning in 2010, the Company prioritized orders by identifying the items that were 'key' for the season and to a particular "program." Id. at ¶ 62. The Company's Merchants provided a list of the "top ten" items for the "programs," which was used as the basis for prioritizing orders and determining which vendors should be paid. Id. He/she received this list from one of the Global Sourcing Managers. Id. The list was ultimately presented to the Finance Manager for Sourcing who used the prioritized orders to determine which vendors should be paid and which the Company could

avoid paying in light of its financial constraints.  Id.  CW 17 understood that the Company's Chief Supply Chain Officer had directed that orders be prioritized.  Id.  CW 17 reported that although late shipments had occurred in 2009, the number of late shipments from vendors was higher in 2010.  Id. at ¶ 64.

CW 11, who was Manager of Store Finance alleges that from mid-2009 until at least April, 2010 (when CW 11 left the Company), internal sales targets were revised constantly downward.[5]  Id. at ¶ 91.  Beginning in the summer of 2009, Scarpa held monthly profit and loss meetings.  Id. at ¶ 87.  CW 11 attended these meetings along with approximately twenty other employees of executive and manager level.  Id.  CW 11 was responsible for producing a weekly "dashboard report," referred to internally as "the Timeline."  Id. at ¶ 89.  The Timeline included "virtually all store-related sales data" for the previous week and compared the numbers to the same week in the previous year.  Id.  The Timeline was prepared by one of CW 11's subordinates and it was sent to the entire Executive Committee of the Company, including Sullivan and Scarpa.  Id. at 90.  CW 11 reported that Sullivan was "the ultimate customer for that report" and knew that Sullivan looked at the report closely because she sometimes asked questions about it prior to the Executive Team meetings.  Id.

Statements of April 13-15, 2010

On April 13, 2010, Talbots issued a press release reporting the Company's financial results for the fourth quarter and fiscal year ended January 30, 2010.  Id. at ¶ 116.  The press

---

[5] The Plaintiffs do not allege that the various forecasts of its sales cited in the Second Amended Complaint differed from the then-current internal projections.  That is, they do not allege that that Company said one thing to the market while receiving or relying upon different internal projections.

release "touted the Company's gross margin improvement of 2,070 basis points, a significant

increase in fourth quarter operating income, continued strong cost savings as well as completion

of its comprehensive financing transactions." Id.  The press release included the following

alleged misrepresentations by Scarpa:

> We delivered a strong fourth quarter, capping off a successful year of tremendous
> change and innovation. **Our strategic transformation – re-energizing our brand,
> modernizing our merchandise, streamlining our organization and improving
> our business processes – firmly positions us for future growth and profitability**.
>    .          .          .
>
> Outlook
> **For the full year 2010, the Company anticipates a top-line sales increase in the
> range of approximately 3% to 5% compared to the prior year period**. Adjusted
> operating income, excluding restructuring, impairment and merger costs, is
> anticipated to be in the range of approximately 5% to 6% of sales. These anticipated
> results compared to fiscal 2009 sales of $1,235.6 million and adjusted operating
> income of $11.2 million, or 0.9% of sales.
>
> Id. at ¶ 117 (emphasis in original).

In a conference call with analysts and investors on the same date, Scarpa allegedly made

the following misrepresentations:

> What a difference a year makes. It's very gratifying to look back at the operational
> changes we successfully implemented. **The disciplined execution in inventory
> management, supply chain and expense control has been very strong and while
> the transformation of our Company and brand has been a huge undertaking,
> especially when moving as quickly as we did in this economic climate, the
> benefits are many**.
>
>    .          .          .
>
> **Turning now to our 2010 outlook, for the full year, we are planning for top line
> sales growth in the range of approximately 3% to 5% compared to last year**.
> Adjusted operating profit excluding restructuring, impairment and merger cost is
> planned to be at approximately 5% to 6% of sales.
>
>    .          .          .

**We've done a remarkable job in terms of some of the sourcing initiatives we've put into place to lower our costs**, and that's a big contributor to the overall decrease. In fact in our retail stores right now, we're really only down about 5% on a unit basis, so a lot of the decline is really reflected on the cost progress that we've made but I think as we look out into next year, I think we can look for inventories to continue to be down in the first half of the year, **again driven by some of the sourcing improvements that we'll see**, and then in the second half, I think they level off and potentially have the opportunity to have a low single digit increase, and that's cost again offset [sic] by some of the more aggressive buying that will take place in the second half of the year. Obviously we're focusing on key categories when we go out we buy it, and there's a huge initiative around the non-apparel end of the business, particularly around jewelry and scarves and the like so you can see I think inventory start to be up low single digits at the end of the year next year.

Id. at ¶¶ 117-119 (emphasis in original).

On April 15, 2010, the Company filed its year-end results for the fiscal year January 31, 2009 with the SEC on Form 10-K, signed by Sullivan and Scarpa, which contained the following alleged misrepresentations:

Further, **we re-engineered our business practices in 2009, particularly in the areas of inventory management, sourcing and supply chain, and store operations**. We benchmarked against industry best-in-class practices and developed more modern, efficient and flexible methods of conducting business in a dynamic retail environment. We made adjustments to our initiatives throughout the year in response to the weak economic environment, including actions designed to further streamline our organization, further reduce our cost structure and better optimize gross margin performance through stronger inventory management and improved initial mark-ups resulting from changes to our supply chain practices.
.       .       .

Results of Operations
Reflected in Talbots store sales was a $218.3 million, or 19.3%, decline in comparable store sales for 2009, which was generally in line with our expectations due to the lackluster customer shopping behaviors we experienced throughout the first half of the year. We believe this was a carryover from the latter part of 2008 as the difficult economic environment significantly influenced consumers discretionary spending. When our customer was shopping, key fashion items at entry level price points were the main driver of sales. **We remained steadfast in managing on lean inventory while improving our flow of merchandise**, optimizing our markdowns and presenting our customer with a stronger mix of full-price to markdown

13

merchandise.

Id. at ¶ 121 (emphasis in original).

The Plaintiffs allege that as a result of the statements made in the Company's press release, conference call and Form 10-K, the price of the Company's stock rose by 8.8 % between April 12, 2010 and April 15, 2010.  Id. at ¶ 122.  Moreover, FBR Capital Markets "reiterated its Outperform rating on the Company's stock and raised its priced target from $18 to $20."  Id. at ¶ 120.

The Plaintiffs allege that the April 13-15, 2010 statements were each materially false and misleading because "the Defendants knew that the Company's inventory management, expense control, and sourcing practices were not leading a turnaround of the Company," but that in fact, the Company had been late in paying vendors, resulting in disputes which caused orders to be delayed or canceled and which led to increased costs to the Company.  Id. at ¶ 123.  The Defendants also knew that "[t]hese issues were already beginning to manifest themselves in the form of Talbots' merchandise not arriving in the Company's stores on time."  Id.  Additionally, the Company had been revising internal sales targets downward "for some time" and thus the Defendants had no reasonable basis for giving the 2010 sales guidance numbers that they provided."  Id.

In its 2009 Form 10-K, dated April 15, 2010, the Company warned that, "*Our overseas merchandise purchasing strategy makes it vulnerable to certain risks and any disruption in our supply of merchandise would materially impact us.*" Docket # 59-8 at 15 (emphasis in original). Similarly, it warned that "[t]here can be no assurance that one or more of our suppliers may not slow or cease shipments or require or condition their sale or shipment of merchandise on more

stringent payment terms.  If this was to occur and we did not or were not able to adequately

respond, it could materially disrupt our supply of merchandise."  Id.   It also noted that,

> [o]ur ability to successfully implement our strategic initiatives and continue to
> improve our operating results depends upon a significant number of factors, many of
> which are beyond our control, including:  . . .  sufficiency at all times of available
> cash flows and other internal and external cash resources to satisfy all future
> operating needs and all other cash requirements  . . .  adequate and uninterrupted
> supply of merchandise and continuation of merchandise purchases on open account
> purchase terms from merchandise vendors at expected levels and at acceptable
> accounts payable terms . . .  effective inventory management and maintaining
> adequate levels of customer-appropriate inventory

Docket # 59-8 at 14.

Summer 2010 Factual Allegations

According to several confidential witnesses, throughout 2010 merchandise failed to

arrive in certain stores until well after it had appeared in Company catalogs.  Docket # 53 at ¶¶

64-70.  For example, CW 2 (who in 2010 served as a consultant to a financial advisor whose

clients held stock in the Company) visited Company stories in approximately August, 2010 and

found that virtually none of the merchandise featured in the August, 2010 catalog was available

in stores in North Carolina, or online.  Id. at ¶¶ 24, 76-79.  CW 17 (an Assistant Sourcing

Manager) reported that late shipments due to a failure to timely pay vendors increased in 2010

and 2011, including inventory ordered for the 2010 Christmas season.  Id. at ¶ 64.  CW 3 (a

Minnesota Store Manager) reported that throughout 2010, his/her store often received

merchandise days or weeks after it had debuted in catalogs (rather than several weeks prior, as

was intended).  Id. at ¶ 65.  CW 3 would receive "visuals" from the Company describing how

new merchandise should be displayed, but that virtually every visual plan he/she received in

2010 included merchandise he/she did not have in his/her store.  Id. at ¶ 66.  CW 4 (General

Manager of a store in Santa Clara, California) likewise reported that it was rare for his/her store to receive merchandise featured in a catalog on time.  Id. at ¶ 65.  CW 8 (a District Manager overseeing twelve retail stores in North and South Carolina) and CW 12 (a General Manager of two stores in West Virginia) reported similar experiences with regard to merchandise featured in catalogs arriving late or not at all.  Id. at ¶ 67.  CW 12 was told upon expressing concern to the District Manager that all of the Company's stores were in the same situation.  Id. at ¶ 68.

Similarly, CW 14 (who was the a Sourcing Director for knits and sweaters between June 2010 and June 2011) received in June 2010 an email circulated among Company executives (including the Vice President of Sourcing and the  Executive Vice President and General Merchandising Manager) which described late payments and their potential "make or break" impact of late delivery of sweaters and the fact that an "exorbitant" number of late orders meant that inventory was not arriving at the store level in time to be set up for the scheduled launches of products.  Id. at ¶¶ 80-81.

The Plaintiffs allege that Sullivan and Scarpa knew that the Company was unable to pay its vendors and understood the impact that fact would have upon the Company's sales in the second half of 2010.  Id. at ¶¶ 83-101.  Because of their access to confidential and proprietary information concerning the Company's operations, finances, financial condition, and present and future business prospects, Sullivan and Scarpa knew or should have known that the Company's difficulties with its vendors and resulting supply problems had been concealed from the investing public, for the purpose of misleading it.  Id. at ¶ 83.

For example, Sullivan and Scarpa attended quarterly "townhall" meetings where the failure to pay vendors was openly discussed, as did Executive Vice President and Chief Supply

Chain Officer Poole.  Id. at ¶¶ 84-85.  During one such "townhall" meeting in the second or third quarter of 2010, a confidential witness who was a Buyer asked a direct question in the presence of Sullivan and Scarpa about the late payments to vendors and specifically stated that business was "being jeopardized" and that vendors were withholding orders, and asked when vendors could expect to be paid.  Id. at ¶ 85.  Poole provided a response to the question confirming that vendors had not been paid, but not responding to the question to the confidential witness's satisfaction.  Id.  Similarly, a confidential witness who was a Manager of Outlet Operations reports that at a "townhall" meeting in approximately August, 2010, an employee asked the executive management (including Scarpa and Sullivan) to respond to the issue of vendors not being paid and the Company not receiving timely shipments.  Id. at ¶ 86.  Sullivan's response was that the Company was paying vendors "as needed" and was seen by the questioner as tacit confirmation that the Company was not paying vendors in a timely fashion.  Id.

Scarpa was a participant in monthly profit and loss meetings.  Id. at ¶ 87.  Both Sullivan and Scarpa were also recipients of a weekly "dashboard report" known internally as "the Timeline."  Id. at ¶ 89.  It included "virtually all store-related sales data for the previous week" and also compared the week's sales numbers to the same week the prior year.  The Timeline was created by a Financial Analyst who reported to CW 11 (who was the Manager of Store Finance).  Id. at ¶ 90.  It was received by the Company's entire Executive Committee, including Sullivan and Scarpa, and Sullivan was the "ultimate customer for" the Timeline.  Id.  CW 11 knew that Sullivan looked closely at the Timeline, because she sometimes asked questions about it prior to the weekly executive team meeting.  Id.

CW 11 also stated that Scarpa desired "complete control over anything going on in

finance" and was "very, very plugged in" to the Company's sales figures and its finances in general.  Id.  According CW 14 (who was a Sourcing Director), the Company maintained spreadsheets detailing the "dollar impact" of late deliveries on sales.  Id. at ¶ 92.  Similarly, CW 16 (then an Assistant Global Sourcing Manager) stated that the number of late orders was so large that Sourcing personnel maintained an Excel spreadsheet of late orders, intended for use by senior management at senior management meetings.  Id. at 93.  A "brand moment" is a term used to refer to when there was a "floor change," i.e., when the Company put new clothes into stores. Id. at ¶ 81.  The spreadsheet maintained by Sourcing personnel was commonly known as the "missed brand moments chart" and was intended to permit senior management to explain the reasons underlying such missed brand moments.  Id. at ¶ 93.  Merchandising kept a similar spreadsheet tracking late deliveries.  Id. at ¶ 94.  These were used by the General Merchandise Manager in meetings with Scarpa to keep Scarpa informed with respect to late orders.  Id.

Similarly, the Director of Global Logistics and Customers Compliance prepared a monthly Brand Moment Report, showing a "snapshot" of what percentage of merchandise was "on time, what specifically is late."  Id. at ¶ 95.  This report was sent to several Company executives, including inter alia the Vice President of Warehousing, the Merchandising Director, the Executive Vice President and Chief Supply Chain Officer, the Vice President of Merchandise Planning, the Vice President of Merchandising, the General Merchandise Manager and the Senior Vice President of Sourcing and Development.  Id.  According to the Assistant Global Sourcing Manager witness, the Director of Global Logistics and Customers Compliance also sent an email entitled "brand moment statistics" to the Sourcing personnel "every couple of days" detailing which "brand moments" were missed.  Id. at ¶ 97.  The witness stated that

"missed brand moments" occurred "fairly frequently" throughout 2010 and into 2011.  Id.

Sourcing managers also emailed Buyers concerning late orders and the reasons why orders were

shipped late, including instances where vendors were not paid on a timely basis.  Id. at ¶ 98.

Sullivan and Scarpa also "were able to, and did, control the contents of the Company's

SEC filings, reports, press releases, and other public statements."  Id. at ¶ 66.  Each signed

certifications during the Class Period attesting to the accuracy of the information contained in the

Company's filings.  Id. at ¶ 100.

<u>June 8, 2010 Misrepresentations</u>

On June 8, 2010, the Company issued a press release reporting financial results for the

first quarter of 2010, and commenting on its outlook for second quarter and fiscal year 2010.  Id.

at ¶ 125.  It included the statement that

> For the full year 2010, the Company updated its previously announced guidance.
> **The**
> **Company continues to anticipate top-line sales increase in the range of**
> **approximately 3% to 5% compared to the prior year period. Full year adjusted**
> **earnings per share from continuing operations are anticipated to be in the**
> **range of approximately $0.75 to $0.83 per share, excluding merger-related**
> **costs, restructuring and impairment.** This compares to an adjusted loss per share
> from continuing operations of $0.10 reported last year.  **For the second quarter**
> **2010, the Company anticipates top line sales increase of approximately low**
> **single digits.** Adjusted earnings per share from continuing operations are anticipated
> to be in the range of approximately $0.00 to $0.05 per share, excluding
> merger-related costs, restructuring and impairment compared to last year's adjusted
> loss per share from continuing operations of $0.33.
>
> Id. (emphasis in original).

On the same day, the Company hosted a conference, in which both Sullivan and Scarpa

participated.  Id. at ¶ 126.  On that call, Scarpa made the following alleged misrepresentation:

> Total sales from continuing operations were $320.7 million, compared to $306.2
> million last year in line with Company expectations. ***As a result of improvement in***

*our inventory management,* full price selling increased 21% and markdown sales declined 31% in the quarter. Store sales were $257.6 million compared to $256.4 million last year. Comp store sales increased 2.4% for the 13 week period.

.     .     .

Merchandise inventories at the end of the quarter were $157 million, down 17.9% to last year's $191 million and down 19% on a selling square foot basis. This decrease is due to lower levels of markdown merchandise *and our continued focus on inventory management*. Total debt outstanding at the end of the quarter was $94.1 million down $420.6 million to last year's balance of $514.7 million.

Id. (emphasis in original).

During the conference call, Sullivan stated that:

I think the only other thing I would add is we've been very strategic where we've gone back and added inventory to categories that we have increasing confidence, being as productive as we want them to be, so *we're quite pleased with the inventory strategies as we go through the balance of the year*.

Id. at ¶ 127 (emphasis in original).

The Plaintiffs assert that these statements were misleading because the Defendants "knew that inventory for the fall and winter product lines were not going to make it to the Company's stores on time, and therefore, their statements that the Company was in good shape on full price inventory omitted information that was material to a reasonable investor." Id. at ¶ 128.

In its June 8, press release, the Company incorporated by reference the cautionary statements in its Form 10-K and 10-Q filings, and stated that additionally, investors should consider various other risk factors and uncertainties, including:

[the Company's] ability to continue to purchase merchandise on open account purchase terms at existing or future expected levels and with acceptable payment terms and the risk that suppliers could require earlier or immediate payment or other security due to any payment concerns; risks and uncertainties in connection with any need to source merchandise from alternate vendors; any disruption in our supply of merchandise . . . [the Company's] ability to successfully execute, fund, and achieve supply chain initiatives, anticipated lower inventory levels, cost reductions, and

other initiatives.

Docket # 59-10 at 8-9.

<u>September 8, 2010 Misrepresentations</u>

On September 8, 2010, the Company issued a press release reporting results for the second quarter, revising its previously announced outlook downward, from a 3% to 5% top-line increase to a top-line sales increase of low-single digits.  <u>Id.</u> at ¶ 129.  Sullivan made the following misrepresentations within the press release:

> ***Our second quarter and year-to-date results demonstrate the steady progress we are making as a result of our strategic initiatives***. In the second quarter, we again generated significant gross margin expansion, successfully managed expenses and achieved better than expected improvement in adjusted earnings per share. Our top-line sales performance reflects our decision to remain on plan with respect to our promotional event calendar within what proved to be an aggressively promotional environment. Nevertheless, we are pleased to have continued to see double-digit increases in our full-priced selling, which is in line with our focus on improving margins through ***strong inventory management*** and which we believe demonstrates that our merchandise is resonating with customers. ***Overall, we are pleased with our team's continued sound execution, which enabled us to maintain the momentum that began in the third quarter of last year when we returned to profitability***.
>
> .          .          .
>
> While we are mindful of the current macroeconomic conditions, ***we continue to be confident in our strategy. We are entering the fall season with a strong inventory position and initiatives already in place that we believe will help drive continued improvement across our business and long-term sustainable growth and profitability***.

<u>Id.</u> at ¶¶ 130, 132 (emphasis in original).

The press release also included the following alleged misrepresentation (not attributed directly to Sullivan):

Cost of sales, buying and occupancy as a percent of net sales improved 720 basis

points to 65.1% compared to 72.3% in the same period last year. This improvement was due primarily to a 620 basis point increase in merchandise margin, resulting from strong IMU, improved full-price selling and *disciplined inventory management*. Buying and occupancy costs as a percent of net sales improved 100 basis points primarily due to lower depreciation costs.

Id. at ¶ 131 (emphasis in original).

The Company followed the press release with a conference call, during which Sullivan

made the following alleged misrepresentations:

Overall, we're pleased with our second quarter and year to date performance. *We have maintained the momentum that began last September and again achieved strong operating results as we continue to implement our strategic initiatives aimed at continuous improvement and profitability*.

.          .          .

Throughout the quarter, we remained focus[ed] on achieving our goal of maximizing margins, with an emphasis on full price sales. *We successfully managed expenses and inventory* and achieved better than expected year-over-year adjusted earnings per share. Our performance for the quarter and year to date demonstrate the steady progress we are making and we are pleased with our team's continued sound execution.

*We are entering the fall season with a strong inventory position*, a compelling merchandise assortment, and key initiatives already in place, and we are encouraged as the first marketing event of the season, our denim launch, is off to a great start. We believe we will drive continued improvement across our business and long-term sustainable growth and profitability.

.          .          .

*We've also made a change to how we flow product this fall compared to last. Rather than deliver heavy fall merchandise in early August, we opted to flow the heavier fall products in early September*. That way, our customer can enjoy fresh and inviting deliveries post-Labor Day, where she is most likely to engage in buying. *This has resulted in lower quarter-to-date sales versus a year ago. But we're confident that with the new fall products becoming available this week in stores and in the rest that we can quickly reverse that trend*.

.    .    .

*In closing, we are pleased with how we are positioned going into the back half of the year and remain confident in our ability to execute as we look forward*. While we are continuing to implement our turnaround initiative, we have made significant improvements to our brand, products, and marketing and believe we are moving into a new stage, focusing on those initiatives that will drive both top and bottom line growth. We are also operating with a substantially improved capital structure, which will enable us to continue to invest in these initiatives. We recognize that we are in a challenging environment and are planning conservatively, but we remain committed to ongoing operational improvement and steady progress in our initiatives to deliver long-term shareholder value.

.    .    .

*I think the right way to look at the third quarter, Janet,*[6] *is to really look at the guidance. We're guiding to low single-digit increases in the quarter. We made a conscious decision not to bring in heavy products early*. And we started the quarter very clean from a markdown perspective. So we're actually – we're pleased with where we are. We're pleased with the decision. I think it's timed right to the consumer's interest in buying that kind of product.

And from what I can see in the world at large, there's not a lot of people selling a lot
of heavy fall early in August. So we have the benefit of putting in a floor set, actually, this week this year that is totally fresh to last year's. So we're actually are quite pleased with how the quarter is developing. And of course, the denim launch was and will continue to be a very important addition to the third quarter business. *So we're feeling – I think the best way to evaluate our third quarter because of this shift, is to really rely on the guidance that we've provided*.

.    .    .

*We're guiding to single-digit increases in the quarter*. We made a conscious decision not to bring in heavy product early. And we started the quarter very clean from a markdown perspective. So, we're actually -- we're pleased with where we are.
We're pleased with the decision.

.    .    .

--------------------------------

[6] An analyst who asked "why the Company's inventories seemed low." Id. at ¶ 137.

23

***So, we actually are quite pleased with how the quarter is developing***. And of course the denim launch was and will continue to be very important addition to the third quarter business. So, we're feeling -- I think ***the best way to evaluate our third quarter because of these shifts is to really rely on the guidance that we've provided***.

Id. at ¶¶ 133-134, 136-138 (emphasis in original).

On the same conference call, Scarpa made the following alleged misrepresentation:

***Turning now to our 2010 outlook, for the full year we anticipate top line sales growth in the range of approximately low single digits compared to last year, below our previously announced guidance for a 3% to 5% increase***. This reflects our current year to date results and our conservative posture going forward given the uncertain macro environment and cautious consumer mindset. Full year adjusted earnings per share, excluding special items, are now anticipated to be in the range of approximately $0.84 to $0.92 per share, an increase over our previously announced guidance of $0.75 to $0.83 per share, reflecting our improved second quarter results. ***Our gross margin rate is expected to increase by approximately 550 basis points versus a year ago, as a result of*** stronger full price selling, increased initial markups, ***and continued discipline, inventory management***.

Id. at ¶ 135 (emphasis in original).

The Plaintiffs allege that the September 8, 2010 statements described supra were materially false and misleading because the Defendants knew that the Company was not entering the fall season with a strong inventory position, but rather merchandise was consistently arriving to stores late. Id. at ¶ 140.

As a result of the September 8, 2010 press release and conference call, the price of the Company's stock dropped from a closing price of $11.11 per share on September 7, 2010, to a closing price of $10.97 per share on September 8, 2010. Id. at ¶ 139.

The Plaintiffs assert that the Defendants' misleading statements on that date prevented "more of the artificial inflation in the price" of the Company's stock from being released, as it would have had the investors been aware of the Company's inability to pay its vendors and the

24

impact of same.  Id.

October 5, 2010 Misrepresentations

On October 5, 2010, Talbots issued a press release providing an update on its third quarter and full year fiscal 2010 outlook.  Id. at ¶ 141.  The Company reported expecting a top-line sales increase of approximately 1% compared to the prior year period, less than the projected increase of "approximately low single digits."  Id.  In the press release, Sullivan made the following alleged misrepresentation:

> We are pleased with our overall first half performance and the successful launch in the third quarter of key initiatives, including an enhanced marketing campaign, segmentation strategy and store-reimage program. While customer traffic in our stores in the third quarter has been inconsistent, which is a reversal of the improving trends we saw in the first half of the year, sales in our direct business continue to trend positive quarter-to-date. That said, *we do believe we are solidly positioned for the remainder of the fall as well as the upcoming holiday season*. Further, we continue to have confidence that we have the right strategies in place to achieve longterm sustainable growth and profitability.

> Id. at ¶ 142 (emphasis in original).

On the same day, the Company hosted an Investor's Meeting, in which Sullivan and Scarpa participated.  During this telephone call, Sullivan made the following alleged misrepresentations:

> At this moment in time, Talbots has embarked on the next phase of the strategic plan that was set in motion when I joined the Company in September 2007. Today, *Talbots continues to realize benefits from our turnaround initiative with significant improvements in brands, products, marketing as well as our capital structure and overall business processes and systems*. Our updated strategy plan begins with the Company's target consumer, builds mechanisms to achieve growth, insure Talbot has the right infrastructure and people to execute and is designed to provide enhanced return to investors. We are transforming this Company.

> .          .          .

> *Today we are investing in strategic initiatives that we believe will create long term*

25

***growth, continuous improvement and enhanced profitability, initiatives that will drive future business momentum***. These include continuing our store segmentation strategy, rolling out our store reimage program, investing in marketing, a renewed focus on key concepts, furthering the growth in our upscale outlets, capitalizing on direct to consumer channels and leveraging our beneficial Li & Fung partnership. ***And as always, focusing on disciplined inventory management***.

As I noted in our release, so far this quarter we are encouraged by the early response to marketing and store productivity initiatives, but we have seen inconsistent customer traffic during the quarter, which has led us to revising our top line outlook. ***With that said, we believe we are solidly positioned for the remainder of the fall season, as well as the upcoming holidays***.

.          .          .

Further, we continue to have confidence that we have the right strategies in place to achieve long term sustainable growth and profitability, and we'll be talking with you about these today. ***Overall, as we look at our recent financial performance and our long term outlook, we are gaining ground with*** sales of full price merchandise, decreased occupancy expenses, increased productivity ***and our commitment to disciplined inventory and expense management***

.          .          .

Turning to our current strategic framework, Talbots has embarked on the next phase of the strategic plan. ***We continue to implement our turnaround initiatives.*** However, we are ready to take new important steps and our updated strategic plan begins with our target consumer and builds on mechanisms to achieve growth. Today
***I can assure you that Talbots is focused on the right initiatives and has the right team to provide enhanced returns to investors.***

<u>Id.</u> at ¶ 143 (emphasis in original).

During the same telephone call, Scarpa made the following alleged misrepresentations:

To that end, 2009 brought forth considerable change. ***A focus on improved sourcing, inventory management*** and a strong presentation of full priced merchandise across all channels drove significant gross margin improvement.

.          .          .

***All these metrics point to a stable and steadily improving business.*.**

As a result of the lower sales expectation for the current quarter, we have adjusted our full year outlook for top line sales to be up approximately 1% versus the prior outlook for positive low single digits. ***Even so, we are reconfirming full year adjusted earnings per share to be in the range of $0.84 to $0.92, again, pointing to the strength of the underlying business and the platform we have created***.

.       .       .

In summary, I would like to leave you with a few key financial takeaways. ***We have made huge progress to-date and have put our company on extremely solid footing. This cannot be overstated. Our balance sheet is strong and we are well positioned for growth, we are taking a prudent approach to investing in and managing our business given the current environment***.

Id. at ¶ 144 (emphasis in original).

The Plaintiffs allege that as a result of the partial disclosure of the Company's true financial condition and future business prospects in the press release and conference call, the price of the Company's stock dropped 14.6% between October 4, 2010 and October 5, 2010 and would have fallen further, absent the Defendants' misrepresentations. Id. at ¶ 145.

The Plaintiffs allege that the October 5, 2010 statements described supra were misleading because the Defendants knew that the Company was not solidly positioned, given that "record-breaking" amount of merchandise the Company had advertised for sale which was not actually available in stores. Id. at ¶ 146.

                    December 7, 2010 Misrepresentations

On December 7, 2010, the Company issued a press release announcing results for the third quarter and year-to-date period ended October 30, 2010. Id. at ¶ 147. The Company further decreased its outlook for the fourth quarter and fiscal year 2010 (from an approximate 1% increase, to flat to down 1%). Id. The press release also revealed Talbots' total inventory

increased 11.3% to $184.7 million, compared to $165.9 million at the end of the third

quarter 2009.  Id.

In the press release, Sullivan made the following alleged misrepresentation:

Our customer traffic and sales demand from Thanksgiving through Cyber Monday
improved greatly, however, we believe the challenging and promotional environment
will continue. To that end, we will stay nimble and have appropriately enhanced our
promotional activity to best position ourselves for the remainder of this holiday
season, ***effectively managing our inventory***, while preserving the integrity and
health
of our brand. As we look forward, we believe it is prudent to be conservative in our
near-term outlook, ***but we remain confident in our overall strategy and our ability
to achieve our long-term objectives***.

Id. at ¶ 148 (emphasis in original).

On the same day, the Company hosted a conference call, in which Sullivan and Scarpa

participated.  During this telephone call, Sullivan made the following alleged misrepresentations:

As stated earlier, in light of the increasingly aggressive promotional environment, we
began to introduce new promotional activities towards the end of the third quarter to
better position ourselves with our customers. We are offering additional new
innovative promotions in the fourth quarter, with pre-planned weekly events,
including limited time web events, secret sales, and sweepstakes that have all proven
to be successful. We enhanced our Best Customer Event in November and our
holiday gift rewards, re-engaging with this critical segment of customers to
demonstrate that loyalty has its perks. With an overall enhanced promotional
strategy, ***we believe we are appropriately positioned to manage our inventory and
capture our share of her holiday spending for gifts and for herself***. We remain
focused on continuing to drive improvements across our business, both in the short
and long-term.

.       .       .

***I think we feel very well-positioned for the holiday. It was the right move for us to
front load the season.*** It gave us a very strong Thanksgiving through Cyber Monday.
We were in much better position than we were a year ago and had much better
results, so we feel that that was the right thing to do.

.       .       .

*I would just like to reiterate that we feel like we are well-positioned for holiday.* This guidance does reflect and give us -- allows us to be a bit more nimble in the promotional environment that we are currently navigating. That said, we're proud of how the product looks. We're excited by the learnings, the early learnings of segmentation and marketing and customer acquisition. So there's a tremendous amount to look forward to as these strategies continue to get executed in the brand. We're very confident in our future and we're confident in your patience as we get to that future.

Id. at ¶¶ 149, 153, 1 (emphasis in original).

During the same telephone call, Scarpa made the following alleged misrepresentations:

Merchandised inventories at the end of the quarter were $184.7 million, up 11.3% to last year's $165.9 million. *This increase is due to a planned increase in receipts for the fall season, the timing of holiday receipts, as we front loaded deliveries ahead of the holiday season compared to last year, as well as lower than anticipated sales volume*.

.        .        .

*For the fourth quarter, we anticipate top line sales to be in the range of approximately flat to down, low single digits, compared to last year*. We anticipate adjusted earnings per share to be in the range of a loss of $0.05 per share to earnings of $0.03 per share versus last year's adjusted earnings per share of $0.13. Our gross margin rate is expected to decrease by approximately 330 to 430 basis points versus a year ago, reflecting a stepped up promotional cadence and higher level of markdowns due to lower than anticipated sales volume.

Turning now to our full year 2010 outlook, based on our year-to-date results and our current sales trends, *we now expect top line sales for the full year to be approximately flat to down 1% compared to last year. Full year adjusted earnings per share, excluding special items, are now anticipated to be in the range of approximately $0.70 to $0.78 per share, a decrease from our previously announced expectations of $0.84 to $0.92 per share*. Capital expenditures for 2010 are planned to be approximately $38 million, with Q3 spending to date of approximately $19 million, reflecting continued investments in refreshing and renovating our stores, as well as ongoing IT initiatives. In closing, in Q4, we will focus on strategic promotional activity to stay competitive and to clear inventory to position us appropriately for the spring season. In addition, we will continue to deploy investment dollars into initiatives critical to the long-term success of the business.

.        .        .

So when I look at Q4 sales and I look at the trend that we've been on for the first six weeks, it's very similar to the trends that we saw in October and ***we continue to improve off of what was a very disappointing first half of the Q3***. The guidance around flat to low single digits reflects a comp that is anywhere probably in the 2 to 350 basis points, negative.

.        .        .

***Our point of view is that we're well-positioned from an inventory perspective*** and we're well-positioned from a promotional perspective ***to drive the sales that we gave you on the guidance***.

Id. at ¶¶ 150-152 (emphasis in original).

In response to a question concerning Talbots' inventory increase, Scarpa stated that "approximately two-thirds of the $19 million increase" in inventory was due to front loading the inventory.  Id. at ¶ 154.  He added that:

***Our overall inventories when we look at our surplus area are in excellent shape, relatively flattish overall, but the aging of it is much more current. I look at the inventory increase for the quarter of $19 million and basically two-thirds of it is related to receipt flow from holiday and one-third is really from the sales miss in the third quarter in terms of our initial expectations around sales. Roughly $6 million of inventory was being carried over into 4Q from 3Q that we hadn't originally anticipated that that would have been gone***.

Id. (emphasis in original).

The Plaintiffs allege that as a result of the Defendants' December 7, 2010 "partial revelation of the truth regarding Talbots' financial condition and future business prospects," the price of the Company's stock dropped 22.6% between December 6, 2010 and December 7, 2010, on trading of almost six times the stock's average daily volume.  Id. at ¶ 156.

The Plaintiffs allege that the December 7, 2010 statements of the Defendants described supra were misrepresentations because the increase in inventory reported was not due to a

planned increase in receipts for the fall season, or front loaded deliveries ahead of the holiday

season, but rather was due to the Company's having failed to pay many of its vendors in 2009,

which resulted in the Company receiving inventory late for the second half of 2010 and not

having merchandise in its stores on time to correspond with the marketing of the particular

season's products.  As a result, much of the inventory went unsold and the Company was

saddled with excess inventory which the Defendants knew it could not sell at full price.  Id. at ¶

157.

   Business Update of January 11, 2011

   On January 11, 2011, the Company issued a Business Update, in which it revealed that its

quarter-to-date top line sales were down approximately 7% and that quarter-to-date comparable

store sales were down approximately 6%.  Id. at ¶ 158; Docket # 59-20 The Company also

lowered its earnings guidance, projecting fourth quarter adjusted loss per share to be in the range

of $0.15 to $0.19 (compared to the prior year's adjusted earnings per share of $0.13, and the

previously- announced range of an adjusted loss of $0.05 per share to adjusted earnings from

continuing operations of $0.03 per share).  Docket # 53 at ¶159.  The Company also announced

that full-year adjusted earnings per share were now expected to be in the range of $0.56 to $0.60

per share, compared to the previously-announced range of $0.70 to $0.78 per share).  Id.

   In the January 11, 2011 Business Update, the Company reported that although it had

"experienced solid selling trends from Thanksgiving through Cyber Monday," sales declined

thereafter, which the Company attributed to "a combination of factors, including a weaker than

anticipated customer response to our current merchandise assortment, high levels of competitive

promotional activity in the market and weather-related issues."  Docket # 59-20 at 2.  The

Business Update did not refer to any vendor relations problems or difficulties in procuring inventory.  Id.

The Plaintiffs allege that the revelations in the Business Update "caused the remaining artificial inflation to come out of the price of the stock" with the effect that the price of the Company's stock dropped another 17.4% between January 10, 2011 and January 11, 2011, on trading of almost six times the stock's average daily volume.  Id. at ¶ 160.

Procedural Background

The Defendants filed this putative class action on February 3, 2011.  Docket # 1.  On April 25, 2011, the Court allowed the motion of the Macomb County Retirement System for appointment as lead plaintiff and for appointment of lead counsel.  Docket # 21.  On July 27, 2011, the lead plaintiff filed its Amended Class Action Complaint.  Docket # 24.  On August 31, 2011, the Court entered as its Order the Amended Joint Scheduling Stipulation of the Parties, providing for a briefing schedule for the Defendants' response to the Amended Complaint.  Docket # 26.  On October 17, 2011, the Defendants filed their Motion to Dismiss.  Docket # 29.  Briefing was completed by January 17, 2012, but before a hearing was held, the Plaintiffs sought and received leave to file a Second Amended Complaint.  See Electronic Order of June 11, 2012.  A Second Amended Complaint was filed on August 15, 2012.  Docket # 53.  On September 20, 2012, the Defendants moved to dismiss the Second Amended Complaint.  Docket # 56.  Briefing was completed by December 20, 2012, and the Court conducted a hearing on the motion on May 22, 2013.

II.     DISCUSSION

Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The court "must accept all well-pleaded facts alleged in the Complaint as true and draw all reasonable inferences in favor of the plaintiff." Watterson v. Page, 987 F.2d 1, 3 (1st Cir.1993).  This "highly deferential" standard of review "does not mean, however, that a court must (or should) accept every allegation made by the complainant, no matter how conclusory or generalized." United States v. AVX Corp., 962 F.2d 108, 115 (1st Cir.1992).  Dismissal for failure to state a claim is appropriate when the pleadings fail to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir.1997) (quoting Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir.1988) (internal quotation marks omitted). The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Iqbal, 556 U.S. at 678.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.  Id.  The Court's assessment of the pleadings is "context-specific," requiring "the reviewing court to draw on its judicial experience and common sense." Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir.2009)(quoting Iqbal, 129 S.Ct. at 1949). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief." Id.

In considering the merits of a motion to dismiss, the Court may look only to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be taken.  Nollet v. Justices of the Trial Court of Mass., 83 F.Supp.2d 204, 208 (D.Mass.2000), aff'd, 248 F.3d 1127 (1st Cir.2000). "[M]atters of public record are fair game in adjudicating Rule 12(b)(6) motions, and a court's reference to such matters does not convert a motion to dismiss into a motion for summary judgment."  In re Colonial Mortgage Bankers Corp., 324 F.3d 12, 19 (1st Cir.2003).

A claim for securities fraud must also comply with Fed. R. Civ. P. 9(b) and must satisfy the exacting requirements of the Private Securities Litigation Reform Act of 1995 ('PSLRA'). See Fed. R. Civ. P. 9(b) (allegations of fraud must be stated with particularity); 15 U.S.C. § 78u–4(b)(2) (complaint must "state with particularity facts giving rise to a strong inference" of scienter); see also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) (noting the "[e]xacting pleading requirements" of the PSLRA).  Any private securities complaint alleging that the defendant made a false or misleading statement must: (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u–4(b)(1); and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," § 78u–4(b)(2). Tellabs, 551 U.S. at 321.

### Count I - Section 10(b) of the Exchange Act and Rule 10b-5

Count I of the Second Amended Complaint is directed against all Defendants and is for violations of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder. Docket # 53 at ¶¶ 178-189.  Section 10(b) of the Exchange Act makes it unlawful "[t]o use or

employ, in connection with the purchase or sale of any security . . . any manipulative device or contrivance."   15 U.S.C. § 78j(b).  SEC Rule 10b–5 implements § 10(b) by declaring it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

For the Plaintiffs to prevail on their claim that the Defendants violated Section 10(b) and Rule 10b–5, they must prove six elements: "(1) a material misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."  <u>Mississippi Public Employees' Retirement System v. Boston Scientific Corp.</u>, 649 F.3d 5, 20 (1st Cir.2011).

### <u>Count I - Section 10(b) Claim</u>

The Defendants assert an array of arguments to defeat the Second Amended Complaint. See Docket #57.  I recommend allowing the motion to dismiss in light of defendants' arguments that the Plaintiffs have failed, under the applicable legal standards, to allege sufficiently (1) material misstatements, (2) made with the requisite degree of scienter; and (3) causing loss.

### <u>Sufficiency of Allegations of Materiality</u>

The Defendants argue that the misrepresentations alleged in the Second Amended Complaint concerning the Company's vendor relations and inventory flow issues are not actionable because they lack sufficient allegations of materiality.  <u>See</u> Docket # 57 at 25-26

(quoting <u>Colby v. Hologic, Inc.</u>, 817 F. Supp. 204, 209-10 (D. Mass.March 30, 1993) (Young, J.) (citing <u>Basic, Inc. v. Levinson</u>, 485 U.S. 224, 238 (1988)) ("A complaint mounted upon § 10(b) or Rule 10b–5 must offer a sufficient allegation of 'materiality,' <u>i.e.</u>, enough information to ascertain the significance of the misrepresentation based upon the indicated probability that the (described or omitted) event would occur and the anticipated magnitude of the event upon the totality of company activity").  To fulfill the materiality requirement "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." <u>Basic, Inc.</u>, 458 U.S. at 231-32.  Section 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information. <u>Matrixx Initiatives, Inc. v. Siracusano</u>, — U.S. —, 131 S.Ct. 1309, 1321 (2011).  "Disclosure is required under these provisions only when necessary 'to make . . .  statements made, in the light of the circumstances under which they were made, not misleading.' <u>Id.</u> (quoting 17 CFR § 240.10b–5(b)).

There is no doubt that the Plaintiffs have alleged that the Company had (at least) some problems paying vendors on time, that the payment problems resulted in some late or cancelled deliveries and that some Company stores suffered from late arrival of merchandise.  Pleading materiality, however, is not the same as pleading an undisclosed problem.  Not all late arrivals of shipments require disclosure on their own, or even in light of the affirmative statements made in this case.  <u>See</u> <u>Id.</u>

Here, the Plaintiffs' materiality allegations suffer from several problems.  First, their allegations and theory do not fit the record facts.  The Plaintiffs allege vendor payment problems beginning at least as early as 2008 and continuing into 2010.  They contend that given the nine-

month to one-year lead time between order and delivery of clothing products, the Company necessarily knew by early 2010, at the latest, that it would not receive timely deliveries of clothing products during the fall and holiday selling seasons in 2010.  Thus, the various optimistic statements cited in the Second Amended Complaint were necessarily material misrepresentations, in the Plaintiffs' view.

The Plaintiffs point to various reports from a variety of sources of the late arrival of products in stores, especially in the August, 2010 period.   The Company points out that it had 232 vendors during the relevant period and more than 580 stores.  See Docket # 59-16 at 12; Docket # 59-8 at 4.  The Second Amended Complaint highlights problems with only a handful of specific vendors (see, e.g., Docket # 53 at ¶¶ 46, 48, 51, 55, naming five specific vendors) stores (see, ¶¶ 65-68, 75-80 concerning six-twelve[7] stores) and product lines (see ¶¶ 70-73, describing issues with three product lines).  Whether or not these allegations, standing alone, would suffice to render material information about the vendor payment problems/late delivery of merchandise in light of the statements made by the Company during the Class Period is not before the Court as the allegations do not stand alone.

The vendor payment problems substantially predate the Class Period.  Under the Plaintiffs' theory, late deliveries and inventory shortfalls due to vendor payment problems should have plagued or crippled the Company by the Summer of 2009, with progressively increasing severity, according to the Plaintiff's theory.  Yet, the Company reported a slight increase in sales for the first nine months of 2010 over the same period in 2009.  Docket #59-17 at 12.  These sales numbers belie the contention that the magnitude of the vendor payment

---

[7]  The Second Amended Complaint is vague with respect to the number of stores visited by CW 2 in North Carolina, referring to "several" and "some other" stores.

problems rendered the issue material.  This is somewhat unsurprising given the allegations of the Second Amended Complaint.  The significance of the payment issue to the Company's business derives to a large extent from CWs 5 and 6, each of whom left the Company prior to, or near the beginning of, the Class Period (January, 2010 and October, 2009 respectively).  Docket #53 at ¶¶ 27-28, 56.  Notably, the Company received a large cash infusion to help meet its liquidity needs in January, 2010, just when CW5 left and shortly after CW6's departure.  Id. at ¶ 4.

CW 14 reports that the late delivery of sweaters was seen by the Company as a "make or break" issue for the fourth quarter of 2010.  However, the email quoted does not connect the late deliveries to the vendor payment issues described elsewhere in the Second Amended Complaint, but rather states that with respect to ten sweater lines, there are "a lot of delivery issues for various reasons . . .  not sure what the issue was."  Docket # 53 at ¶ 80.

Finally, two additional points bear mention.  The Company was not affirmatively stating that it had no vendor payment problems or a nearly perfect record of timely deliveries.  Moreover, the late 2010 sales collapse arose from "weaker than anticipated customer response to [the Company's] current merchandise assortment, high levels of competitive promotional activity in the market and weather-related issues."  Docket #59-20 at 2.  Nowhere did the Company refer to vendor payment problems or difficulties in procuring inventory as the source of its disappointing holiday sales.  Id.  The Plaintiffs did not allege that this statement of reasons constitutes a misrepresentation or a concealment of the true reasons for the sales decline.  They do point to an independent report that converting customer visits into sales was the Company's failing in 2010.  See Docket #53 at ¶ 116.  That the low conversion rate arose from a lack of inventory (as opposed to poor merchandise assortment and high promotional activity, as stated

38

by the Company ) stands on the thin reed of a one-sentence assertion in the Second Amended

Complaint without any supporting authority or source.  See Id.[8]

In these circumstances, the Plaintiffs have failed to allege that the vendor relations and

inventory flow issues, in the context of the totality of the Company's business, render these

allegations material within the meaning of Section 10(b).  However, even if the Court finds that

the Plaintiffs have cleared the materiality bar, they have failed to sufficiently plead scienter.[9]

### Sufficiency of Allegations of Scienter

The Defendants next assert that Count I of the Second Amended Complaint fails to state

a claim because its allegations fail to support a strong inference of scienter.  Docket # 57 at 29-

33.

The PSLRA requires plaintiffs to state with particularity both the facts constituting the

alleged violation (the subject of the preceding section), but also the facts evidencing scienter,

i.e., the defendant's intention ''to deceive, manipulate, or defraud.''  Tellabs, 551 U.S. at 311.

(quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12 (1976)).  Plaintiffs must ''state

with particularity facts giving rise to a strong inference that the defendant acted with the required

---

[8]  While the Second Amended Complaint does contain other allegations describing vendor payment problems and related late arrivals of product at earlier time periods as noted supra, these allegations are insufficient for the reasons already discussed.

[9]  The fact that the materiality of the misrepresentations is at least seriously questionable is a relevant factor to the Court's analysis of scienter, infra.  See, City of Dearborn Heights Act 345 Police & Fire Retirement System v. Waters Corp., 632 F.3d 751, 757 (1st Cir.2011) ("The question of whether a plaintiff has pled facts supporting a strong inference of scienter has an obvious connection to the question of the extent to which the omitted information is material").  "[T]he question of whether Defendants recklessly failed to disclose [a fact] is ... intimately bound up with whether Defendants either actually knew or recklessly ignored that the [fact] was material and nevertheless failed to disclose it." Id. (citing City of Philadelphia v. Fleming Cos., 264 F.3d 1245, 1265 (10th Cir.2001).

state of mind.'' 15 U.S.C. § 78u–4(b)(2).  To qualify as strong, "an inference of scienter must be

more than merely plausible or reasonable—it must be cogent and at least as compelling as any

opposing inference of nonfraudulent intent." <u>Tellabs</u>, 551 U.S. at 314.  The Plaintiffs must show

that the Defendants acted with "either conscious intent to defraud or a high degree of

recklessness."  <u>ACA Fin. Guar. Corp. v. Advest, Inc.</u>, 512 F.3d 46,        58 (1st Cir.2008).

"Knowingly omitting material information is probative, although not determinative, of scienter."

<u>Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp.</u>, 523 F.3d 75, 87 (1st Cir.2008).

"[G]eneral inferences that the defendants, by virtue of their position within the company, 'must

have known' about the company's problems" are insufficient. <u>Lirette v. Shiva Corp.</u>, 27

F.Supp.2d 268, 283 (D.Mass.1998) (Young, J.) (citing <u>Maldonado v. Dominguez</u>, 137 F.3d 1, 9

(1st Cir.1998)).  Nor are "general allusions to unspecified internal corporate information" or

documents sufficient to show scienter.  <u>Id.</u> at 283.

> A 10b–5 plaintiff must allege details of defendants' alleged fraudulent involvement, including specifics as to what defendants had knowledge of and when. To satisfy this requirement, complaints typically identify internal reports, memoranda, or the like, and allege both the contents of those documents and defendants' possession of them at the relevant time.

<u>Isham v. Perini Corp.</u>, 665 F.Supp.2d 28, 34 (D.Mass.2009) (Gorton, J.) (quoting <u>In re</u>

<u>Boston Technology, Inc. Securities Litigation</u>, 8 F.Supp.2d 43, 57 (D.Mass.1998) (Lasker, J.))

The Court is to consider the Second Amended Complaint in its entirety, as well as other

sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss (in

particular, documents incorporated into the complaint by reference, and matters of which a court

may take judicial notice) in order to ascertain whether all of the facts alleged, taken collectively,

give rise to a strong inference of scienter –  not whether any individual allegation, scrutinized in

isolation, meets that standard.  <u>Tellabs</u>, 551 U.S. at 322-23.

To determine whether the Plaintiffs have alleged facts that give rise to the requisite ''strong inference'' of scienter, the Court must consider plausible, nonculpable explanations for the Defendants' conduct, as well as inferences favoring the Plaintiffs.  <u>Id.</u> at 323-24.  The inference that the Defendants acted with scienter need not be irrefutable or of the "smoking-gun" variety, but it must be more than merely ''reasonable'' or ''permissible''— "it must be cogent and compelling, thus strong in light of other explanations."  <u>Id.</u> at 324.

The Court finds that the Second Amended Complaint fails to allege facts giving rise to a strong inference (<u>i.e.</u>, one that is more than merely plausible or reasonable, <u>see</u> <u>Tellabs</u>, 551 U.S. at 314) that the Defendants acted with "either conscious intent to defraud or a high degree of recklessness."

There are no allegations at all in the Second Amended Complaint concerning the process by which the Company devised the challenged projections or its disclosures.  No CW is alleged to have participated to any degree in their preparation, or to have communicated with any Defendant about any of the vendor relations issues or inventory problems alleged in the Second Amended Complaint.  Thus, there is no allegation that that information which the Plaintiffs maintain was concealed from the market (<u>i.e.</u>, the vendor payment issues and the resulting inventory flow issues) had not been adequately considered and factored into the Company's statements to the market.   Moreover, the totality of the allegations the Plaintiffs make actually suggest that the Company <u>did</u> consider whatever level of problems existed in the projections it made and the statements it offered.  According to the Plaintiffs, the Company closely tracked the effect of late deliveries upon "brand moments," prioritized vendor payments to promote the flow

of the most needed items, and generally monitored this and other financial information constantly.  See, e.g., Docket # 53 at ¶¶ 61-62, 89-90, 93-94.[10]

The Plaintiffs' allegations of scienter rely heavily upon the concealment by the Defendants of conditions which it is alleged would inevitably lead to missed sales.  See, e.g., Docket # 53 at ¶ 58 ("delays in vendor payments meant delays in delivery of merchandise and, ultimately, missed sales").  As noted previously (see supra at 37-38), however, the Second Amended Complaint fails to plausibly demonstrate that the vendor payment issues and resulting inventory flow issues identified therein necessarily would lead to the revised estimates revealed in the January, 2011 Business Update.  Indeed, as discussed supra regarding materiality it appears otherwise.

Moreover, the totality of the circumstances undermines rather than supports the Plaintiffs' contention of scienter.  The Company plainly suffered from many disclosed problems including vendor payment problems prior to the beginning of the Class Period.  The Second Amended Complaint reveals a large cash infusion in January, 2010, and a concerted focus upon management of the cash to maximize the Company's performance and minimize problems that might result from liquidity shortfalls.  For example, the Plaintiffs describe not only the cash infusion and related financing, but new sourcing initiatives and inventory management techniques, and strategies such as the prioritizing of overdue vendor payments.  See Docket # 53

---

[10]  The Plaintiffs also make much of the allegation that the Company continually revised downward internal sales projections.  See, Docket # 53 at ¶¶ 91, 123. However, the public projections made by the Company during the Class Period declined over time and, importantly, the Plaintiffs never allege or even argue that the Company's internal projections differed from, let alone contradicted, its public projections.

at ¶¶ 4-5, 62. These allegations simply do not support the required scienter.[11]  Further, the very

reasons for the Company's sales shortfall in late 2010 appear unrelated to the problems advanced

by Plaintiffs. See supra.

In these circumstances, I cannot conclude that a failure to disclose the information

indicated either an intent to defraud or a high degree of recklessness.  For this reason alone, I

recommend that the Court allow the motion to dismiss.

### Sufficiency of Allegations of Loss Causation

The Defendants also contend that Count I of the Second Amended Complaint fails to

adequately plead loss causation.

Although the Defendants contend that the Plaintiffs have failed to plead loss causation

with the requisite particularly, loss causation is subject to the pleading rules of Rule 8(a)(2) (i.e.,

"a short and plain statement of the claim showing that the pleader is entitled to relief"), and the

PSLRA does not impose any heightened pleading standard with regard to loss causation.  Dura

Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 346 (2005) (neither the federal rules of civil

procedure nor the securities statutes imposes any pleading burden with respect to loss causation

beyond that of Rule 8(a)(2)).  To adequately plead loss causation, a plaintiff who has suffered an

economic loss must "provide a defendant with some indication of the loss and the causal

connection that the plaintiff has in mind."  Id. at 347.

What the Plaintiffs allege with respect to loss causation is that via the misrepresentations

---

[11]  While Plaintiffs are under no obligation to pled motive (see Aldridge v. A.T. Cross
Corp., 284 F.3d 72, 82 (1st Cir.2002) (PSLRA does not mandate a particular test for scienter,
and a plaintiff may plead motive and opportunity as part of the effort to establish scienter),
nevertheless, there is no reason apparent here for an intent to defraud or for the required high
degree of recklessness.

alleged in the Second Amended Complaint and described supra, the Company hid from investors

the difficulties it was having in paying its vendors and the resulting inventory control problems

(as well both the potential and real impact of same upon the Company's sales and profitability)

and that following partial disclosures about the Company's true financial position, the

Company's stock price fell.

Notably absent from the Second Amended Complaint, however, is any allegation that the

drop in stock price occurred because the Company made disclosures to the market concerning its

vendor relations problems and/or a resulting lack of inventory (or, that any such disclosures were

ever made at all).   Similarly, there is no allegation within the Second Amended Complaint that

the Company's "true financial position" was actually caused by the vendor relations problems

and/or lack of inventory described therein (rather than by the factors cited by the Company in its

January 11, 2011 Business Update – namely, "a weaker than anticipated customer response to

our current merchandise assortment, high levels of competitive promotional activity in the

market and weather-related issues").   The Plaintiffs do not allege in the Second Amended

Complaint that the Company's statement of reasons underlying the deterioration in "selling

trends" was inaccurate or misleading.

The Defendants rely on In re Alkermes Sec. Litig., 2005 WL 2848341, at *12 (D.

Mass.Oct. 6, 2005) (Lindsay, J.), in which the Court allowed a motion to dismiss for a failure to

plead loss causation with particularity.   See Docket # 57 at 33 (quoting Id. at *11)  (the

Plaintiffs "must allege that 'the subject of the fraudulent statement or omission was the cause of

the actual loss suffered, i.e., that the misstatement or omission concealed something from the

market that, when disclosed, negatively affected the value of the security'").   In that case, Judge

44

Lindsay noted that the Complaint lacked any allegation that the manufacturing-related misrepresentations alleged had any connection to an FDA non-approval letter and subsequent decline in the defendant Company's stock.  Id.  Judge Lindsay quoted at length from Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161 (2 Cir., 2005), in which the Second Circuit found that to establish loss causation, "a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered," i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Lentell, 396 F. 3d at 173 (citation omitted).   The loss alleged must "be caused by the materialization of the concealed risk."  Id.  Loss causation concerns the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant.  Id. at 174.  Where the connection is attenuated, or if the plaintiff fails to "demonstrate a causal connection between the content of the alleged misstatements or omissions and 'the harm actually suffered,' a fraud claim does not lie.  Id.

Here, the Second Amended Complaint alleges an attenuated connection between the fall in the Company's stock price and the alleged misrepresentations.  While the Plaintiffs allege that the market reacted to the Company's true financial position, they do not allege that that position was caused by the misrepresentations concerning vendor relations and resulting inventory problems, rather than by the reasons announced by the Company.   They do not allege that the market ever became aware of the vendor relations issues.  The Business Update reported "solid selling trends from Thanksgiving through Cyber Monday" and a deterioration in the last two weeks of December, 2010 and into January.  Docket # 59-20 at 2.  Moreover, for the reasons already noted, the Plaintiffs have failed to allege sufficiently their position.

Accordingly, for this reason alone, I RECOMMEND that the Court ALLOW the motion to dismiss Count I.

### Other Sufficiency of Pleading Issues

The failure to plead adequately materiality, scienter and loss causation (standing alone, or in combination) suffice to warrant allowing the motion to dismiss. The Defendants have advanced a number of other arguments in support of their motion to dismiss. For the purpose of a complete analysis of all the arguments advanced in this Report and Recommendation, I proceed to address the Defendants' other theories.

The Defendants have also asserted that Count I of the Second Amended Complaint fails to plead or identify actionable misstatements or omissions: (1) because the forward-looking statements therein are not actionable because the Plaintiffs do not plead that the Company's projections are false and because they are protected by the PSLRA's safe harbor provisions and the "bespeaks caution" doctrine; (2) because puffery alleged therein is not actionable; (3) because the Plaintiffs do not plead false or misleading statements with sufficient particularity in that they conflate terminology and because revisions of Company guidance demonstrate there were no misstatements); (4) and, because the Plaintiffs do not plead actionable omissions. Docket # 57 at 16-29.

#### Disclosure of Risks

The Defendants argue that the alleged omissions concerning the Company's vendor payment issues, product delays and the impact thereof upon sales are not actionable because the Defendants "identified specific risk factors in each of the filings and earnings calls that relate to the very issues Plaintiff alleges caused Talbots' earnings miss." Docket # 57 at 19-21 (citing

Docket # 58-2 (counsel's table listing cautionary statements regarding sourcing and merchandising flow); Docket # 59-8 (2009 Form 10-K, dated April 15, 2010, at 11-13).[12]

The "bespeaks caution doctrine" provides that "when statements of 'soft' information such as forecasts, estimates, opinions, or projections are accompanied by cautionary disclosures that adequately warn of the possibility that actual results or events may turn out differently, the 'soft' statements may not be materially misleading." Glassman v. Computervision Corp., 90 F.3d 617, 626 (1st Cir.1996) (quoting Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1213 (1st Cir. 1996); Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d 12, 30 (D.Mass.2000) (Young, J.) (citing Shaw, 82 F.3d at 1213).

The Defendants point to disclosure statements made before and during the Class Period. For example, they point to the fact that in their 2008 Form 10-K (dated April 16, 2009), the Company disclosed that, "we may not be able to achieve our expected improvement in operating results, working capital and cash flows," and identified "a significant number of factors" including "achieving our sales plan for fiscal 2009," "achieving our cash flow plan for fiscal 2009, particularly during our peak inventory build ups in advance of principal selling seasons," and "adequate and uninterrupted supply of merchandise, and continuation of merchandise purchases on open account purchase terms merchandise vendors at expected levels and with extended invoice payment dates." Docket # 59-1, at 13-14.

Similarly, in its December 10, 2009 Form 10-Q (following by two days the alleged misrepresentations described at ¶¶ 102-109 of the Second Amended Complaint, see supra at 6-

---

[12]  For the related argument that certain other statements are protected by the PSLRA's safe harbor provision, see infra at 54.   Here the Defendants are concerned only with disclosures relating to vendor and inventory issues.

8), the Company disclosed that:

> our business and our forward looking statements involve substantial known and unknown risks and uncertainties, including the following risks and uncertainties:
>
> • any lack of sufficiency of available cash flows and other internal cash resources to satisfy all future operating needs and other Company cash requirements
>
> .       .       .
>
> • our ability to achieve our 2009 financial plan for operating results, working capital, liquidity and cash flows

Docket # 59-4 at 35.

The alleged misrepresentations of April 13, 2010 (see Docket # 53 at ¶¶ 116-19, supra at 11-12) were followed by April 15, 2010 disclosures in the Company's 2009 Form 10-K that:

> there is a risk that our suppliers and vendors could respond to any decrease or concern with our liquidity or negative financial results by requiring or conditioning their sale of merchandise to us on stringent payment terms, such as requiring standby letters of credit, earlier or advance payment of invoices or payment on delivery, or other assurances or credit support.   There can be no assurance that one or more of our suppliers may not slow or cease shipments or require or condition their sale or shipment of merchandise on more stringent payment terms.  If this was to occur and we did not were not able to adequately respond, it could materially disrupt our supply of merchandise.

> Docket # 59-8 at 13.

The alleged misrepresentations of June 8, 2010 (see Docket # 53 at ¶¶ 125-27, supra at 18-19), September 8, 2010 (see Docket # 53 at ¶¶ 129-35, supra at 20-23) and December 7, 2010 (see Docket # 53 at ¶¶ 147-154, supra at 27-29) were each accompanied by similar disclosures on the same days in the Company's Forms 10-Q that the Company's ability to meet its cash needs and satisfy its operating costs depended inter alia upon the Company's future operating performance.  Docket #s 59-9 at 24-25; 59-12 at 29; 59-17 at 31.

48

A number of the alleged misrepresentations concerning inventory management are certainly "soft" forecasts, estimates, opinions, or projections which, being accompanied by the cautionary disclosures as noted, <u>supra</u>, are inactionable under the "bespeaks caution" doctrine. <u>See</u>, <u>e.g.</u>, Docket # 53 at ¶¶ 107, 109, 117, 143.

The Plaintiffs, however, do not merely allege a lack of disclosure concerning the future risks with respect to vendor payments and merchandise supply.  They also allege that the Defendants made misrepresentations as to already-existing conditions – that is, that the Defendants concealed from investors the fact that vendor payment problems and resulting merchandise availability issues were a real and present difficulty faced by the Company in 2009 and 2010.  For example, the Second Amended Complaint alleges that vendor payment issues arose in 2008 and had become worse by mid-2009.  <u>See</u> Docket # 53 at ¶¶ 46-53.  These vendor issues are alleged to have resulted in cancelled orders, and in vendors <u>inter alia</u> raising their prices and consigning orders on arrival in the United States. <u>Id.</u>  at ¶¶ 46-47, 49, 53-55. The Plaintiffs allege that as a result, at least some of the Company's stores were late receiving merchandise throughout 2010. <u>Id.</u> at ¶¶ 55-58.

In this context, statements describing in positive terms the current conditions and recent past performance of the Company with respect to inventory management and cost control (such as those alleged in Paragraphs 102-03, 106, 108, 113-14, 118, 121, 126-27, 130-31, 133, 144, 148-50,  152-55) are at least arguably not "forward-looking" statements of the type which can be rendered inactionable by the presence of cautionary disclosures.

<u>Puffery</u>

The Defendants next assert that most of the alleged misrepresentations in the Second

Amended Complaint (and especially those involving Sullivan and Scarpa's characterizations of the Company's strategic initiatives and competitive position) are inactionable puffery.  Docket # 57 at 21-22 (citing as examples Docket # 53 at ¶¶ 108, 113-14, 121, 127, 130, 133, 137-38).

"The corporate puffery rule applies to loose optimism about both a company's current state of affairs and its future prospects." Fitzer, 119 F.Supp.2d at 23.  Because "the recent trend is to consider expressions of corporate optimism carefully" however, claims of puffery now require a court to consider (1) "whether the statement is so vague, so general, or so loosely optimistic that a reasonable investor would find it unimportant to the total mix of information" and (2) "whether the statement was also considered unimportant to the total mix of information by the market as a whole ." Brumbaugh v. Wave Sys. Corp., 416 F.Supp.2d 239, 250 (D.Mass.Jan 11, 2006) (Ponsor J.).

Certainly, Scarpa's statement in Paragraph 114 that "we have accomplished a great deal in a very short period of time. We have revitalized our brand, dramatically improved the fundamentals of our business, and restored profitability. Our investment thesis is strong and getting stronger," is mere puffery.   But the same paragraph also includes the specific statement, highly relevant to the Plaintiffs' claims, that "[w]e anticipated a decline in sales in the third quarter due to very lean inventories" and simultaneously touts "improved regular price selling" which drove significantly improved merchandise margins given our strong discipline on inventory management." Docket # 53 at ¶ 114.

In light of the Second Amended Complaint's thesis that the Defendants hid from investors the specific difficulties the Company faced with regard to vendor relations and inventory management, the statements in Paragraph 103 that "in the third quarter" of 2009 . . .

"we effectively managed our inventory" and that in the fourth quarter "[w]e will continue our conservative posture, staying the course with our efforts and discipline around inventory and costs" are not merely loose and vague optimism, but rather allegations of specific deception. The same analysis applies to Sullivan's statement in Paragraph 104 that "[o]ur posture remains conservative . . . with a focus on expense management, inventory control, liquidity, and cash flow."

Similarly, in Paragraph 127, Sullivan makes a specific representation that on June 8, 2010, the Company was "in good shape on full price inventory" and that "we're quite pleased with the inventory strategies as we go through the balance of the year." Docket # 53 at ¶ 127. Given the Plaintiffs' allegations that the Company was in fact experiencing at that time widespread inventory management difficulties, the statements are not mere puffery. Likewise, the Plaintiffs allege that Sullivan intended by the September 8, 2010, statements alleged in Paragraph 130 to counter the market's concerns regarding the Company's having revised its outlook downward, touting the success in the first half of 2010 of specific company initiatives such as "strong inventory management." Id. at ¶ 130. Again, viewed in that context, the statements are not inactionable puffery.[13]

Precision of Terminology

The Defendants next assert that the Second Amended Complaint insufficiently pleads allegations that the Defendants' statements regarding the Company's inventory management initiative and product rollout schedules were misleading in that they misrepresented the true state

---

[13] Although the Defendants argue that "most" of the alleged misrepresentations in the Second Amended Complaint are puffery, they have identified only these nine specific paragraphs.

of affairs.  These allegations, the Defendants argue, have been made with insufficient particularity under either the PSLRA or Fed. R. Civ. P. 9(b), both because they are based upon "vague or uncorroborated conclusions" of confidential witnesses and because the statements themselves, viewed in combination with public disclosures, are demonstrably not misleading in that the Company indicated it intended to reduce inventory as part of its desire to operate as a leaner organization, and did so.  Docket # 57 at 23-27.

The Defendants assert initially that the Plaintiffs conflate the term "inventory management" (which involves, inter alia, maintaining effective systems for tracking and managing inventory on hand and on order, forecasting demand, estimating costs, etc.) with the concepts of  "merchandise flow" and "vendor relations" and that when the terms are used according to their correct meaning, alleged misrepresentations concerning inventory management in the Second Amended Complaint are demonstrably true.  See Docket # 57 at 23-24.  That the Company saw the concepts as distinct (the Defendants assert) is illustrated by statements in its regulatory filings such as that the Company, "remained steadfast in managing on lean inventory while improving our flow of merchandise."  Id. at 25 (citing Docket # 59-8 at 26).

Although the Defendants propose an alternative explanation for the Company's inventory control "problem"  – i.e., that it was not a problem at all, but rather part of a deliberate and successful strategy to run a leaner operation – the Plaintiffs have nevertheless alleged with sufficient particularity that statements to that effect are deliberate attempts to mislead the market by falsely reassuring investors that the Company was focused on inventory management, or by explaining away the Company's low inventory in positive terms.  On a Rule 12 motion, the

Court is obliged to treat the allegations of the Second Amended Complaint as if true (and this applies no less to a Section 10(b) action (see Tellabs, 551 U.S. at 322)), and to consider whether they establish a plausible basis for relief.   Iqbal, 129 S.Ct. at 1949.  The Defendants' alternative explanation of the meaning of the alleged misrepresentations does not itself render them inactionable.

Sufficiency of Confidential Witnesses

Confidential witnesses may be utilized to plead a securities action, provided that provided "they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  In re Cabletron Systems, Inc., 311 F.3d 11, 29 (1st Cir.2002).  A reviewing Court should

> look at all of the facts alleged to see if they 'provide an adequate basis for believing that the defendants' statements were false' . . . [t]his involves an evaluation, inter alia, of the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia.

> Id. at 29-30 (citation omitted)

The Second Amended Complaint includes information allegedly derived from the first-hand knowledge of twenty confidential witnesses.  See Docket # 53 at ¶¶ 23-42.  For each such witness, facts are pleaded describing the witness's position with the Company and how each position provided access to the information pleaded.  Id.  In examining the allegations, the Court concludes that the allegations are sufficient.  The number of different sources "helps the complaint meet the standard." Cabletron, 311 F.3d at 30.  On the face of the allegations, the

sources appear to have a strong basis of knowledge for the statements they make.[14]

<u>Guidance and Outlook Statements</u>

The safe harbor provision of the PSLRA provides immunity for "forward-looking" statements to the extent that, inter alia: "(A) the forward-looking statement is – (I) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."

15 U.S.C. § 78u–5(c)(1).

Vague or boilerplate disclaimers" are insufficient.  <u>In re Sepracor, Inc. Sec. Litig.</u>, 308 F.Supp.2d 20, 34 (D.Mass.2004) (Lasker, J).  To be meaningful, cautionary statements must be "substantive and tailored to the specific future projections, estimates or opinions . . . which plaintiffs challenge." <u>In re Smith & Wesson Holding Corp. Sec. Litig.</u>, 604 F.Supp.2d 332, 340 (D.Mass.2009) (Ponsor, J.) (citation omitted).

Without reference to any specific allegations in the Second Amended Complaint, the Defendants assert that the projections and other forward-looking statements in the Second Amended Complaint alleged to be false are protected by the PSLRA's safe harbor carve-out and the analogous "bespeaks caution" doctrine.  Docket # 57 at18-19.  They assert that their cautionary statements were "not boilerplate" and were "tailored to the matters Talbots contemporaneously announced," yet recite in the next breath that identical language was

---

[14]  Although the Court notes that five of the twenty confidential witnesses were not employed by the Company during the class period, given the timeline alleged by the Plaintiffs, their allegations concerning vendor payment issues prior to the Class Period is relevant and probative.  One of the five (CW2) also worked as a consultant and observed Company stores during the Class Period in that capacity.  The limits of their knowledge goes less to the adequacy of the pleading than to the materiality of their information.  <u>See</u>, <u>supra</u>.

included in all of the SEC filings identified in the Second Amended Complaint.

The Court is prevented from determining whether the disclosures identified are meaningfully tailored to the specific future projections, estimates or opinions which the Plaintiffs challenge by the Defendants' failure to identify the specific allegations in the Second Amended Complaint to which it refers.

Count II - Section 20(a) Claim

Because the Court concludes that the underlying Section 10(b) claim in Count I should be dismissed, the claim in Count II against the Individual Defendants for violation of Section 20(a) should also be dismissed.   ACA Financial Guaranty Corp. v. Advest, Inc., 512 F.3d 46, 67 (1st Cir.2008) (citing 15 U.S.C. § 78t(a)) ("The plain terms of section 20(a) indicate that it only creates liability derivative of an underlying securities violation).

III.    CONCLUSION

For the foregoing reasons, I RECOMMEND that the Court ALLOW the Defendants'

Motion to Dismiss.[15]

                                    /s / Leo T. Sorokin
                                    UNITED STATES MAGISTRATE JUDGE

---

[15] The Parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within 14 days of receipt of this Report and Recommendation.  The written objections must identify with specificity the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections.  See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b).  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Keating v. Secretary of Health and Human Services, 848 F.2d 271 (1st Cir.1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir.1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir.1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir.1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir.1983); see also Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466 (1985).